<u>**AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH WARRANTS**</u>

I, Ray A. Martinez, being duly sworn, hereby depose and state the following:

**INTRODUCTION**

1.     I have been a Special Agent with the Drug Enforcement Administration ("DEA")
since 2023.  I have been assigned to the DEA's New England Field Division's Cross Border
Initiative ("CBI") Task Force, which is part of the Bedford, Massachusetts Division, since
December 2023.  My responsibilities include the investigation of possible violations of federal law,
including conspiracy to distribute and to possess with the intent to distribute controlled substances
(21 U.S.C. § 846); distribution and possession with intent to distribute controlled substances (21
U.S.C. § 841); and other crimes.

2.     At the DEA Academy, I received extensive training in conducting narcotics
investigations, including: surveillance, undercover, and enforcement operations; management of
confidential sources and operations that use confidential sources; and education in the methods
currently employed by drug traffickers and drug trafficking organizations.  Before my employment
with the DEA, I worked as a Customs and Border Protection Officer for the Department of
Homeland Security ("DHS") for about two years and four months.  I also graduated from the
Federal Law Enforcement Training Center's Customs and Border Protection Officer Basic training
program in Brunswick, Georgia where I received additional training in conducting law
enforcement operations.  I also served in the United States Marine Corps from June 2012 to June
2020 on both active and inactive (reserves) status.  I hold a Bachelor of Arts degree from the
University of Texas Arlington in Arlington, Texas.

3.     I have participated in numerous drug investigations.  My experience includes
physical and electronic surveillance, surveillance of undercover transactions, the execution of
search warrants, the effecting of arrests, and the debriefings of defendants, informants, and

witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records. Through my training and experience, I have become familiar with the way in which illegal drugs are imported, transported, stored, and distributed, as well as with the methods of payment for such drugs. I have also become familiar with the way in which narcotics organizations use various forms of violence and intimidation to further their narcotics trafficking activities and to protect their operations, members, drugs, and drug proceeds.

4. I have participated in the execution of search warrants, several of which ultimately led to the seizure of large quantities of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances, United States currency, records of narcotics and monetary transactions, drug customer lists and/or other documents relating to the manufacturing, transportation, ordering, purchasing, and/or distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and/or laundering of drug proceeds.

5. Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate about and further their drug trafficking activities, but are aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and cellular telephones, use multiple cellular telephones simultaneously, use prepaid cellular telephones (where the subscriber of the phone is not required to provide personal identifying information), and use encrypted messaging applications like WhatsApp, Signal, and Telegram, in an effort to thwart law enforcement's use of electronic surveillance. I am also aware that drug traffickers often speak in vague, guarded, or coded language when discussing their illegal business in an effort to prevent detection, and often use text messages in lieu of phone calls to avoid speaking over the telephone.

**PURPOSE OF AFFIDAVIT**

3. DEA is currently investigating Santo Reynaldo SOTO VILLAR for conspiring to distribute controlled substances, a violation of 21 U.S.C. § 846; distributing controlled substances, a violation of 21 U.S.C. § 841(a)(1); and for using a communication facility to facilitate the distribution of a controlled substance, violations of 21 U.S.C. § 843(b) (the "TARGET OFFENSES").

4. I submit this affidavit in support of a applications for three search warrants under Federal Rule of Criminal Procedure 41. Specifically, I seek to search:

    a. **THE "TARGET LOCATION" (26-mj-7175)**: 660 Haverhill Street, Apartment 1, Lawrence, Massachusetts 01841. The National Grid utilities account for the TARGET LOCATION is subscribed to Santos Reynaldo Soto, a name that slightly varies from Santos Reynaldo SOTO VILLAR's full name. Investigators nevertheless believe that SOTO VILLAR is the subscriber. There is probable cause to believe that the TARGET LOCATION contains fruits, instrumentalities, and evidence of the TARGET OFFENSES. The TARGET LOCATION is described in more detail in Attachment A-1.[1]

    b. **THE "TARGET VEHICLE" (26-mj-7176):** A white Honda Accord bearing Massachusetts registration 3XHZ12 and registered to SOTO VILLAR. SOTO VILLAR uses the TARGET VEHICLE in furtherance of the TARGET OFFENSES. There is probable cause to believe that the TARGET VEHICLE contains fruits, instrumentalities, and evidence of the

---

[1] As described in Attachment A-1, the TARGET LOCATION is in a multi-unit mixed use building at 660 Haverhill Street in Lawrence, Massachusetts. I will refer to the entire building in which the TARGET LOCATION sits as the "TARGET LOCATION BUILDING."

3

TARGET OFFENSES.  The TARGET VEHICLE is described in more detail in Attachment A-2.

c. **"SOTO VILLAR" (26-mj-7177):** The person of Santo Reynaldo SOTO VILLAR, DOB: 07/22/1981.  There is probable cause to believe that the person of SOTO VILLAR holds fruits, instrumentalities, and evidence of the TARGET OFFENSES.

5.    Specific items to be searched for and seized from the TARGET LOCATION, the TARGET VEHICLE, and from SOTO VILLAR are listed in Attachment B.  Among other things, they include the mobile phone used by SOTO VILLAR and assigned phone number (978) 228-4228 (the "TARGET PHONE").[2]  There is probable cause to believe that the TARGET PHONE contains fruits, instrumentalities, and evidence of the TARGET OFFENSES.

6.    The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested search warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

7.    This investigation has demonstrated that SOTO VILLAR is a drug trafficker who sells counterfeit fentanyl pills and fentanyl powder in Lawrence, Massachusetts.  On ten occasions between January and May 2026, SOTO VILLAR has sold fentanyl pills and/or fentanyl powder to an undercover officer employed by the Massachusetts State Police ("MSP").  The MSP were conducting an independent criminal investigation during the first six of these transactions.  They were actively cooperating starting with the eighth transaction, executed on April 16, 2026.  Starting

---

[2] There is no subscriber or address associated with this phone number.

with that purchase, all transactions have been monitored, recorded, and surveilled, and all communications with SOTO VILLAR have been preserved.

8.    The investigation has demonstrated that SOTO VILLAR went to the TARGET LOCATION immediately prior to or shortly before many of these transactions, which leads investigators to believe that SOTO VILLAR keeps controlled substances at the TARGET LOCATION.  The investigation has also shown that SOTO VILLAR typically traveled to the controlled transactions in the TARGET VEHICLE and used the TARGET PHONE to facilitate them.

### General Background

9.    In March 2026, DEA investigators began collaborating with colleagues from the MSP Attorney General's Office Enterprise and Major Crimes Division.  MSP troopers told DEA investigators about SOTO VILLAR, who had already sold fentanyl powder and suspected fentanyl pills to an officer acting in an undercover capacity (the "UC") on six occasions.  Investigators confirmed SOTO VILLAR's identity after viewing his driver's license photo.  The UC arranged the series of controlled purchases by exchanging text messages with the TARGET PHONE's user, who investigators believe is SOTO VILLAR.  The transactions are summarized below.  Following these transactions, in about mid-April, DEA and MSP launched a joint investigation of SOTO VILLAR's drug trafficking activities.

| MSP Controlled Buy # | Date | Phone Number Used to Arrange Buy | Location of the Controlled Buy | Suspected Controlled Substance(s) Purchased | Additional information |
|---|---|---|---|---|---|
| 1 | 01-21-2026 | TARGET PHONE | Mayflower Street Lawrence, MA | 21 grams powder fentanyl | SOTO VILLAR arrived in the TARGET VEHICLE. |
| 2 | 01-29-2026 | TARGET PHONE | Stearns Avenue Lawrence, MA | 32 grams powder fentanyl & sample of suspected fentanyl pills | SOTO VILLAR arrived in the TARGET VEHICLE. |
| 3 | 02-11-2026 | TARGET PHONE | Mayflower Street Lawrence, MA | 31 grams powder fentanyl & 100 suspected fentanyl pills | SOTO VILLAR left from the TARGET LOCATION BUILDING in the TARGET VEHICLE.<br><br>On the way, SOTO VILLAR made a brief stop at 2-4 Fitz Street, Lawrence. |
| 4 | 02-24-2026 | TARGET PHONE | Buswell Street Lawrence, MA | 31 grams suspected powder fentanyl & 100 suspected fentanyl pills | SOTO VILLAR left from the TARGET LOCATION BUILDING in the TARGET VEHICLE.<br><br>On the way, SOTO VILLAR made a brief stop at 2-4 Fitz Street, Lawrence. |
| 5 | 02-26-2026 | TARGET PHONE | Buswell Street Lawrence, MA | 22 grams suspected powder fentanyl & 100 suspected fentanyl pills | SOTO VILLAR left from the TARGET LOCATION BUILDING in the TARGET VEHICLE.<br><br>On the way, SOTO VILLAR made a brief stop at 2-4 Fitz Street, Lawrence. |
| 6 | 03-18-2026 | TARGET PHONE | Mayflower Street Lawrence, MA | 42 grams suspected powder fentanyl & 200 suspected fentanyl pills | SOTO VILLAR went to the area of 2-4 Fitz Street, Lawrence, MA in the TARGET VEHICLE.<br><br>MATEO-MEJIA left from the rear door of 2-4 Fitz Street, Lawrence, and met with VILLAR at the TARGET VEHICLE. |

10.     MSP investigators used the TruNarc system to test the powders that SOTO VILLAR sold during the first and second transactions listed above.[3]  Both powders tested positive for the presumptive presence of fentanyl.  Although the remaining substances from these purchases were not subjected to the TruNarc field test, based on experience, training, the packaging of the substances, and their appearance, investigators believe these substances also contain fentanyl.

11.     The table above documents a pattern that SOTO VILLAR used not only in these controlled purchases but also in the purchases conducted with DEA and discussed in more detail below: SOTO VILLAR typically traveled to the transactions in the TARGET VEHICLE.  His travel often originated at the TARGET LOCATION BUILDING.  And he frequently stopped by 2-4 Fitz Street in Lawrence, Massachusetts, on his way.  This leads investigators to believe that controlled substances are stored at both the TARGET LOCATION and at 2-4 Fitz Street.  At this time, we request a warrant only for the TARGET LOCATION.

12.     In addition, immediately before the March 18, 2026, transaction, SOTO VILLAR met with a man who had just come out of 2-4 Fitz Street.  By comparing a high-resolution surveillance photo of the man to photographs from a Customs and Border Protection database and the photo on his Massachusetts driver's license, investigators later identified this man as Francisco MATEO-MEJIA.[4]   SOTO VILLAR continued to meet with MATEO-MEJIA before the

---

[3] TruNarc is a portable device that uses spectrometry and gas chromatography to analyze unknown substances.  The device is commercially available and allows for the rapid and non-destructive identification of narcotics, narcotics precursors, essential chemicals, and cutting agents.  In my experience, TruNarc results are highly accurate when analyzing substances consisting of methamphetamine or fentanyl.

[4] On February 11, 2021, MATEO-MEJIA pleaded guilty to conspiring to distribute 400 or more grams of fentanyl and to possessing fentanyl with the intent to distribute it, violations of 21 U.S.C. § 846 and 21 U.S.C. § 841(a)(1), respectively.  *See United States v. Francisco Mateo-Mejia, et. al.,* Docket No. 1:19-cr-10398-LTS-1.  He was sentenced to time served and released on about June 23, 2021, with no term of supervised release.

transactions described below, as well.  This led investigators to believe that MATEO-MEJIA conspired with SOTO VILLAR to distribute controlled substances and specifically that MATEO-MEJIA provided SOTO VILLAR with the pills he sold to the UC.  This belief is informed by several pieces of evidence, including their surveillance observations and various statements made by SOTO VILLAR in his text messages.  SOTO VILLAR sent one of these statements to the UC in advance of the third buy listed above.  In it, SOTO VILLAR stated, "The pills are not mine." Therefore, investigators believe that SOTO VILLAR used the TARGET LOCATION to store powder fentanyl and received fentanyl pills from MATEO-MEJIA.

### March 30, 2026: SOTO VILLAR Sold the UC about 30 Grams of Suspected Fentanyl Powder and about 500 Suspected Fentanyl Pills

13.    On March 30, 2026, DEA and MSP investigators conducted a controlled purchase during which SOTO VILLAR sold the UC about 30 grams of fentanyl powder and about 500 suspected fentanyl pills.  The UC paid SOTO VILLAR a total of $1,600 in Official Advanced Funds ("OAF").

14.    At about 2:23 p.m. that afternoon, the UC sent the TARGET PHONE a text message requesting 500 pills and three "dedos," or "fingers."[5]    SOTO VILLAR agreed and ultimately suggested meeting at about 4 p.m.  Monitoring a court-authorized global positioning system ("GPS") affixed to the TARGET VEHICLE, investigators saw that, at about 2:47 p.m., the TARGET VEHICLE left the area of 137 Lawrence Street.  They also saw that the TARGET VEHICLE made a brief stop outside the TARGET LOCATION BUILDING at 2:53 p.m.

15.    At about 4:08 p.m., investigators saw SOTO VILLAR park the TARGET VEHICLE in the parking lot next to Pollo Tipico, a restaurant located at 190 Lawrence Street.  At

---

[5] Based on their experience and training, investigators know that "fingers" are 10-gram bags of fentanyl loosely resembling fingers in their packaging.

about 4:05 p.m., investigators saw MATEO-MEJIA leave the rear door of 2-4 Fitz Street. MATEO-MEJIA was still wearing an olive-green hoodie and green sweatpants, which – as seen below – investigators had photographed him wearing earlier that day.



16.     Investigators watched MATEO-MEJIA walk about a tenth of a mile to the TARGET VEHICLE and get in its passenger seat at about 4:07 p.m.  The TARGET VEHICLE then drove toward Fitz Street, where it arrived at about 4:10 p.m.  At almost exactly the same time, SOTO VILLAR used the TARGET PHONE to send the UC a text message that said, "2 minutes."

17.     By about 4:12 p.m., investigators had seen both MATEO-MEJIA go back in the rear door of 2-4 Fitz Street and SOTO VILLAR turn onto Mayflower Street, where he and the UC had previously agreed to meet.  The UC arrived about one minute later and handed SOTO VILLAR $1,600 OAF.  In return, SOTO VILLAR provided the UC with three clear plastic baggies containing a brown powdery substance and one additional clear plastic bag containing about 500 suspected fentanyl pills.

18.     MSP took possession of the suspected fentanyl powder.  DEA took possession of the 500 suspected fentanyl pills.  Investigators did not count the pills, but the bag appeared to contain an number consistent with the negotiated 500 pill total.  Chemical analysis results are

pending from the DEA Northeast Laboratory. However, based on experience, training, the physical appearance of the pills and powder, their packaging, and the prior positive TruNarc field tests described above, investigators believe these substances contain fentanyl. Investigators further believe that SOTO VILLAR picked up the suspected fentanyl powder from the TARGET LOCATION and the suspected fentanyl pills from MATEO-MEJIA, who likely stored them at 2-4 Fitz Street.

**April 16, 2026: SOTO VILLAR Coordinated the Sale of about**
**20 Grams of Fentanyl Powder and about 1000 Suspected Fentanyl Pills**

19.    On April 16, 2026, DEA and MSP investigators conducted a controlled purchase during which the UC bought about 20 grams of powder containing fentanyl and about 1,000 pills suspected of containing fentanyl. SOTO VILLAR coordinated the sale but did not attend it himself. Instead, he sent an unidentified male ("UM") that he described in Spanish as "un priimo *[sic]* … de confianza," or "a trustworthy cousin."[6]

20.    Prior to the transaction, at about 2:52 p.m. that afternoon, the UC sent a text message to SOTO VILLAR at the TARGET PHONE. The UC requested 1,000 pills and two fingers and offered to pay $2,400, to which SOTO VILLAR agreed. After the UC asked whether SOTO VILLAR could get him/her a better price on the pills next time, SOTO VILLAR responded in Spanish, "Lo intentare," or in English, "I'll try."

21.    Shortly after this interaction, at about 3:35 p.m., investigators saw the TARGET VEHICLE arrive at the TARGET LOCATION BUILDING. Investigators then saw SOTO VILLAR get out of the driver's side of the TARGET VEHICLE and go through the front door of the TARGET LOCATION BUILDING. At about 4:01 p.m., investigators saw SOTO VILLAR

---

[6] A bilingual DEA investigator fluent in both English and Spanish provided the translations included in this document. These are preliminary translations subject to revision.

drive the TARGET VEHICLE away from the TARGET LOCATION area.  The TARGET

VEHICLE arrived at 137 Erving Street at about 4:12 p.m.  This address is only about two-tenths

of a mile from 2-4 Fitz Street.  Below is a photo of SOTO VILLAR getting out of the TARGET

VEHICLE at about this time.



22.    At about 4:22 p.m., investigators saw MATEO-MEJIA come out of the back door

of 2-4 Fitz Street wearing a blue hooded sweatshirt, as documented in the photograph below.



Investigators then saw MATEO-MEJIA drive away from 2-4 Fitz Street in a red Honda CR-V with Massachusetts registration 5BMH61 (the "red Honda").[7] MATEO-MEJIA arrived at 137 Erving Street about two minutes later. Investigators then saw SOTO VILLAR approach the passenger side of the red Honda, stay for a few seconds, and then quickly separate. Based on experience, training, and the observations described above, investigators believe SOTO VILLAR met with MATEO-MEJIA to obtain suspected fentanyl pills for this transaction.

23.    Afterward, investigators saw the red Honda drive in a manner that is consistent with countersurveillance.[8] Then, at about 4:29 p.m., MATEO-MEJIA arrived back to 2-4 Fitz Street in the red Honda, got out of the car, and went inside 2-4 Fitz Street using the rear door.

24.    At about 6:30 p.m., SOTO VILLAR used the TARGET PHONE to send the UC text messages suggesting a 7:30 p.m. meeting at 3 Currier Street. SOTO VILLAR also wrote that, because police had stopped him, he would send a trusted friend to meet the UC. At about 7:25 p.m., the UC met with the UM on Currier Street. In an exchange that lasted only a few seconds, the UC gave the UM $2,400 OAF. In return, the UM handed off a black plastic bag. Inside were two clear plastic baggies containing a brown powdery substance and one clear plastic bag containing about 1,000 suspected fentanyl pills, as show in the photograph below. Investigators did not count the pills, but the bag appeared to contain an number consistent with the negotiated 1,000 pill total.

---

[7] This vehicle is registered to Juliani Yasmin Franjul at 1 Tremont Street #7, Lawrence, MA.

[8] Countersurveillance is a technique of avoiding and detecting surveillance. In this situation specifically, the red Honda CR-V (5BMH61) is believed to be driving in a manner to avoid tailing vehicles who may be law enforcement.



25.     The DEA Northeast Regional Laboratory found that the tan powder in the bags weighed a total of 18.8 grams and contained fentanyl.  Chemical analysis of the blue pills is pending.  However, based on experience, training, the physical appearance of the pills, their packaging, the prior positive TruNarc field tests described above, and the chemical analysis of the powder, investigators believe the pills contain fentanyl.

### April 30, 2026: SOTO VILLAR Sold the UC 40 Grams of Fentanyl Powder

26.     On April 30, 2026, DEA and MSP investigators conducted a controlled purchase during which the UC bought about 40 grams of fentanyl powder from SOTO VILLAR.

27.      At about 1:33 p.m. that afternoon, the UC sent a message to the TARGET PHONE requesting four fingers for $800.  The UC also wrote, "You never gave me my gift."  In response, SOTO VILLAR asked in Spanish, "No quieres pastillas," which is translated in English as "You don't want pills?"  SOTO VILLAR added an emoji of a yellow and red capsule.  The UC declined and complained that s/he was "paying a lot for the pills."  SOTO VILLAR responded in English, "The price of the pills is very reasonable.  I can throw in some freebies, but I can't lower the price."  He said that he would give the UC 100 free pills for every 1,000 pills purchased and then concluded, "That's the only thing I can do."  The UC thanked SOTO VILLAR, and they arranged to meet at about 2:30 p.m.

13

28.     Just a few minutes after this text message conversation, at about 1:45 p.m., investigators saw SOTO VILLAR sitting in the driver's seat of the TARGET VEHICLE, which was parked on Erving Avenue, not far from 2-4 Fitz Street.  However, investigators saw that, at about 2:00 p.m., instead of approaching 2-4 Fitz Street before the transaction, SOTO VILLAR drove away.  Based on these observations and the theory that MATEO-MEJIA supplied SOTO VILLAR with suspected fentanyl pills, investigators believe that SOTO VILLAR had no need to visit MATEO-MEJIA at 2-4 Fitz Street because pills were not part of the UC's order.

29.     At about 2:08 p.m., investigators saw SOTO VILLAR park the TARGET VEHICLE near the TARGET LOCATION BUILDING.  A few minutes later, SOTO VILLAR went into the TARGET LOCATION BUILDING.  The UC sent a text message to the TARGET PHONE at about 2:14 p.m. and requested a meeting location.  SOTO VILLAR suggested Mayflower Street.  He left the TARGET LOCATION BUILDING at about 2:21 p.m. and drove away in the TARGET VEHICLE.

30.     At about 2:35 p.m., the UC arrived on Mayflower Street and saw SOTO VILLAR sitting inside the parked TARGET VEHICLE.  The UC got out of his/her own car and approached the TARGET VEHICLE's passenger window on foot.  SOTO VILLAR was the sole occupant of the TARGET VEHICLE.  In an exchange that lasted only a few seconds, the UC handed SOTO VILLAR the $800 OAF, and VILLAR handed the UC several clear plastic bags containing a tan powdery substance.  Stills of the video showing SOTO VILLAR in the driver's seat and the transaction are below.  Upon inspection, it appeared that SOTO VILLAR had included an extra finger as a gift to the UC.





31.     The DEA Northeast Laboratory has since analyzed the tan powder that SOTO VILLAR sold and concluded that it weighs 48.5 grams and contains fentanyl.  Based on experience, training, and the observations described above, investigators believe SOTO VILLAR obtained the fentanyl powder from the TARGET LOCATION before he met with the UC for the drug transaction.

**May 14, 2026: SOTO VILLAR Sold the UC about
2,100 Suspected Fentanyl Pills and about 20 Grams of Suspected Fentanyl**

32.     On May 14, 2026, DEA and MSP investigators conducted another controlled purchase.  This time, SOTO VILLAR sold the UC about 2,100 suspected fentanyl pills and about 20 grams of a tan powdery substance suspected of containing fentanyl.

33.     At about 1:30 p.m. that day, the UC began exchanging text messages with SOTO VILLAR through the TARGET PHONE.  In sum, the UC offered to pay $4,400 for two fingers and "the rest in pills."  SOTO VILLAR agreed, and they arranged to meet at about 4:30 p.m.  SOTO VILLAR also confirmed that this order would include "the 100 freee *[sic]*" pills he had previously promised.

34.     At about 3:09 p.m., investigators saw SOTO VILLAR come out of the exterior door marked "660" at the TARGET LOCATION BUILDING, get in the TARGET VEHICLE, and drive away.  At about 3:26 p.m., investigators saw the TARGET VEHICLE in the rear parking lot of Gomez Multiservice, located at 137 Lawrence Street.

35.     At about 4:27 p.m., investigators saw MATEO-MEJIA leave the rear door of 2-4 Fitz Street and, moments later, saw the red Honda drive toward Lawrence Street.  Surveillance units did not follow the red Honda at that time but found it parked and unoccupied just a few minutes later, at about 4:36 p.m., near 207 Lawrence Street.  Investigators saw SOTO VILLAR come out of Gomez Multiservice about one minute later, walk to the TARGET VEHICLE, and then walk back inside the business.  Investigators could not see whether MATEO-MEJIA and SOTO VILLAR met at this location.  However, based on experience, training, and the facts of this case, investigators believe that, in anticipation of his upcoming transaction, SOTO VILLAR met with MATEO-MEJIA in this area to obtain the fentanyl pills, as he had before previous controlled buys with the UC.

16

36.     The UC arrived at Mayflower Street at about 4:39 p.m. and waited for SOTO VILLAR.  At about 4:44 p.m., SOTO VILLAR arrived driving a black Dodge Durango.  The UC got out of his/her car, walked over to the Dodge's driver's side window, and handed SOTO VILLAR the $4,400 OAF.  In return, SOTO VILLAR handed the UC a black bag containing two clear plastic baggies containing suspected fentanyl powder and a third clear plastic bag containing about 2,100 suspected fentanyl pills.  The UC noted that the Dodge also held a passenger, later identified as its registered owner.  Investigators did not count the pills, but the bag appeared to contain a number consistent with the negotiated 2,100 pill total.  DEA Northeast Regional Laboratory results are pending.  However, based on experience, training, the physical appearance of the pills, their packaging, the prior positive TruNarc field tests, and the DEA laboratory results described above, investigators believe these substances contain fentanyl.

37.     At about 4:53 p.m., investigators saw the Dodge pull into the Gomez Multiservice parking lot, where SOTO VILLAR got out of the driver's seat and went to the TARGET VEHICLE, which was still in the parking lot.  SOTO VILLAR then went inside the business again.  At about 5 p.m., investigators saw MATEO-MEJIA get into the red Honda, which drove back to 2-4 Fitz Street.

38.     Based on training, experience, and surveillance of SOTO VILLAR and of MATEO-MEJIA, I believe that SOTO VILLAR went to the TARGET LOCATION to obtain the suspected fentanyl powder that he sold to the UC.  I believe that MATEO-MEJIA supplied VILLAR with the pills he subsequently sold to the UC and that MATEO-MEJIA likely keeps a pill supply at 2-4 Fitz Street.

## THERE IS PROBABLE CAUSE TO BELIEVE THAT THE SEARCH WARRANT TARGETS  CONTAIN EVIDENCE OF TARGET OFFENSES

39.      Based on my training and experience as well as evidence gathered through physical surveillance, records checks, communications – including phone calls and text messages, and

17

controlled purchases, as detailed above: I submit there is probable cause to believe that the types of evidence listed below will be found in the TARGET LOCATION, in the TARGET VEHICLE, and on SOTO VILLAR's person – including in the TARGET PHONE:

a.      Based upon my training, experience, and the training and experience of other agents with whom I have worked and spoken, I know that drug traffickers often possess and store firearms in their residences in order to protect themselves, their supplies of drugs, and/or drug proceeds.

b.      Narcotics traffickers must maintain, on hand, large amounts of U.S. currency in order to maintain and finance their on-going narcotics business.

c.      It is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them and maintained even after the drugs are sold and/or used.

d.      It is common for drug dealers to secrete contraband, proceeds of drug sales and records of drug transactions in secure locations within their residences, their businesses, and/or other locations which they maintain dominion and control over for ready access and to conceal these items from law enforcement authorities.  As noted above, SOTO VILLAR traveled to almost each of the controlled purchases at which he was present in the TARGET VEHICLE.  Although he did not travel to the actual site of the May 14, 2026, controlled purchase in the TARGET VEHICLE, investigators believe he used the TARGET VEHICLE to obtain suspected fentanyl

18

powder from the TARGET LOCATION and suspected fentanyl pills from MATEO-MEJIA prior to that purchase.

e. Narcotics traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates or business entities to avoid detection of the assets by government agencies.

f. Even though these assets are in the names of others, the narcotics traffickers actually own and continue to use these assets, and exercise dominion and control over them.

g. It is common for persons involved in narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses or other locations which they maintain dominion and control over.

h. Narcotics traffickers often utilize electronic equipment such as computers, cellphones, currency counting machines and tablet devices to generate, transfer, count, record, and/or store the information described above. As detailed above, SOTO VILLAR used the TARGET PHONE to conduct all of the controlled purchases and the surrounding communications.

i. When drug traffickers amass significant proceeds from the sale of drugs, they attempt to legitimize these profits through money laundering activities. To

accomplish these goals, drug traffickers utilize, among other mechanisms, domestic and international banks and their attendant accounts, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency.  Traffickers often co-mingle narcotics proceeds with money generated from legitimate businesses.

j.      Narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies.  In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government.  The "source" of their income reported on these returns is usually falsely said, misleading or generic in terms.  Retained copies of these returns are commonly kept by the traffickers in their residences and businesses.

k.      Traffickers commonly maintain books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization.  Additionally, traffickers maintain ledgers and documents recording drug trafficking activities which include customers, product sold, product purchased, payments made to suppliers and couriers, and other information.

l.      Traffickers take or cause to be taken photographs of themselves, their associates, and their property, and that these traffickers usually maintain these photographs in their possession.

m.      Individuals involved in drug trafficking use various tools, instruments, materials and other paraphernalia to facilitate their trafficking, including weighing

20

the drugs, packaging the drugs, and cutting the drugs.  These types of materials include, but are not limited to: scales, cutting materials, and packaging materials. These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used.  As noted above, SOTO VILLAR sold the UC both large numbers of pills and precise weights of fentanyl powder.  These quantities were almost exactly the weight that was promised.  As such, I believe SOTO VILLAR uses tools such as scales and packaging materials in committing the TARGET OFFENSES.

40.    Based on training, experience, and this investigation, there is probable cause to believe that drug proceeds, documents, and other evidence of drug trafficking as described above and in Attachment B will be found in the TARGET LOCATION, in the TARGET VEHICLE, and on SOTO VILLAR's person – including on the TARGET PHONE.

## CELL PHONES AND COMPUTER DEVICES

41.    Based on my knowledge, training, and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless

21

telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

42.    Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones (which are included in Attachment B definition of "hardware") can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

43.    Seizure of cellular phones containing this information that are being used by SOTO VILLAR will provide information and evidence relating to the TARGET OFFENSES, co-conspirators, and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who engage in the TARGET OFFENSES typically use cellular telephones to communicate with each other, the suppliers of controlled substances and firearms, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that persons who illegally deal in narcotics, and commit acts of violence, regularly keep records of their illegal activities and the coordination of their illegal activity.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific descriptions of firearms, controlled substances and ammunition to be obtained for specific customers, and communications between persons coordinating the commission of violent acts.

44.     Individuals engaged in drug trafficking often take photographs of the drugs and transmit those photographs to their co-conspirators and customers and negotiate prices and availability of drugs with sources of supply and customers.  Records of narcotics trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B on cellular telephones.

45.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers and cellular phones to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

46.     Additionally, I know that drug dealers often use cellular telephones in order to communicate quickly and economically with their co-conspirators, suppliers and customers via the internet.  I am also aware that individuals frequently use cellular telephones and computers to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to dealing in controlled substances, including amounts, prices, and other related information; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where conspirators met, and acts were taken in furtherance of the TARGET OFFENSES.

47.    Based upon my training and experience, and information provided to me by others involved in the forensic examination of cellular telephones, I know that electronic data on cellular telephones and computers can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone or computer; within volatile memory, such as RAM; or on removable media, such as memory cards.

48.    Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.    Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.    Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual

24

memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude

25

the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of

26

additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular

27

thing is not present on a storage medium.  For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

49.    Based on my knowledge and training and the experience of other agents with whom I have spoken,  I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.    The volume of evidence: storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

b.    Technical requirements: analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and

28

its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

50.    Consequently, law enforcement agents are seeking authority to either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

51.    The TARGET LOCATION, the TARGET VEHICLE, and SOTO VILLAR's person may contain computer equipment – including but not limited to the TARGET PHONE – whose use in the TARGET OFFENSES or storage of the things described in Attachment B is impractical to determine at the scene.  Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the premises during the execution of this warrant.  If the things described in Attachment B are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

52.    Law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence listed in Attachment B.

29

**Unlocking a Device Using Biometric Features**

53.    I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

54.    If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through their fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

55.    If a device is equipped with a facial-recognition feature, as many Android, Apple, and other devices are, a user may enable the ability to unlock the device through their face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of their face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face. Similar technology allows users to unlock a device specifically through iris recognition.

30

56.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

57.     As discussed in this affidavit, I have reason to believe that one or more digital devices will be found during the searches. The passcode or password that would unlock the devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

58.     I also know from my training and experience, as well as from information found in publicly available materials, including those published by device manufacturers, that biometric features will not unlock a device in some circumstances, even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, certain Apple devices cannot be unlocked using Touch ID when a certain period of time has elapsed since the device was last unlocked and/or when the device has not been unlocked using a fingerprint and the passcode or password has not been entered in a certain period of time. Similarly, certain Android devices cannot be unlocked with Trusted Face or fingerprint access if the device has remained inactive for a certain number of hours. Other Android and Apple biometric features, and similar features from other brands, carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

31

59.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose biometric features are among those that will unlock the device(s), and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it may be necessary for law enforcement to have the ability to require SOTO VILLAR to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

60.     Due to the foregoing, if law enforcement personnel encounter any devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of SOTO VILLAR to the fingerprint scanner of the devices found on his person; (2) hold the devices found on SOTO VILLAR's person in front of SOTO VILLAR's face and activate the facial recognition feature; and/or (3) hold the devices found on SOTO VILLAR in front of the face of SOTO VILLAR and activate the iris recognition feature, for the purpose of attempting to unlock the devices in order to search the contents as authorized by this warrant. The proposed warrant does not authorize law enforcement to compel that SOTO VILLAR state or otherwise provide the password or any other means that may be used to unlock or access the devices. Moreover, the proposed warrant does not authorize law enforcement to compel SOTO VILLAR to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the devices. I understand that if SOTO

32

VILLAR refuses to cooperate, the matter must be resolved through contempt proceedings rather than through the application of unreasonable physical force.

61.    I further request that the Court authorize law enforcement to change device settings on any seized device(s) to disable "Stolen Device Protection," which is a security measure that can be used to prevent unauthorized access to the device and data. When enabled, however, this feature might prevent forensic tools from being able to extract data from devices.

**CONCLUSION**

62.    Based on training and experience, consultation with other special agents and law enforcement officers, and all the facts and opinions set forth in this affidavit, there is probable cause to believe that SOTO VILLAR has committed the TARGET OFFENSES.  There is also probable cause to believe that evidence of the TARGET OFFENSES and fruits and instrumentalities of the TARGET OFFENSES as further described in Attachment B will be found in the TARGET LOCATION, in the TARGET VEHICLE, and on SOTO VILLAR's person – including in the TARGET PHONE.

_Ray A. Martinez by JCB_
Ray A. Martinez
DEA Special Agent

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by

Honorable Jennifer C. Boal
United States Magistrate Judge

on June _____3_____, 2026.

33